**Samuel GAGE, Appellant,**

v.

**LONE STAR GAS COMPANY, Appellee.**

No. 10307.

Court of Civil Appeals of Texas.

Austin.

April 13, 1955.

Saulsbury, Skelton, Everton, Bowmer & Courtney, Temple, for appellant.

Cox, Brown & Daniel, Temple, Thompson, Knight, Wright & Simmons, Adair Rembert, David M. Kendall, Jr., Dallas, for appellee.

GRAY, Justice.

Appellant here seeks a reversal of an adverse judgment because of jury misconduct.

Appellant sued appellee for damages for personal injuries sustained by him when natural gas in a cold storage room at the Veterans' Administration Hospital in Temple, Texas, exploded. He was an employee at the hospital and in the course of his employment opened the door to the cold storage room, the explosion occurred and he sustained serious injuries.

Various acts of negligence were alleged against appellee as a proximate cause of the explosion and the resulting injuries. However the cause was submitted to the jury on appellant's allegations and evidence that appellee failed to place a malodorant in its natural gas as required by an order of the Railroad Commission. This order or rule provides:

"Rule 2. From and after the date of this Order, every gas company, shall continuously odorize gas by the use of a malodorant agent meeting the requirements set out in Rule 4 of this Order unless such gas shall contain a natural odor complying with Rule 4 hereof."

"Rule 4. The malodorant agent to be introduced into natural gas shall be of such character as to indicate by distinctive odor the presence of gas when such gas is present in air in concentrations of as much as one per cent by volume. By this, it is meant that the gas shall be given an odor by adding an agent that will vaporize, dissolve in or be so diffused with the gas as to produce an odor readily perceptible to normal or average olfactory senses of a person coming from fresh, ungasified air into a closed room or space when gas is present in air in concentrations of as much as one part gas to ninety-nine parts air in said closed room or space."

For the purpose of this opinion we may state that appellee delivered natural gas through a pipeline to a master meter on the hospital grounds. From that meter the gas was piped, through pipes owned by the hospital, to different parts of the hospital for use. The pipe supplying gas to the cold storage room was buried in soil or weathered limestone. Further it appears that the cold storage room was constructed on a concrete wall for its base, it had a cement floor with a hollow space beneath and there were expansion joints or crevices around the floor and between it and the wall. The gas pipe or line passed through the concrete wall and extended under the cement floor. A gas leak occurred in the gas line at a point between the master meter and the cold storage room, the escaping gas then followed the gas pipe or line and entered the cold storage room through the expansion joints or crevices. Only a few minutes before the explosion occurred the door to the cold storage room had been opened for a group of ten women who were volunteer workers for the hospital and who were on an inspection tour of the hospital. One or two of these ladies entered the room and the others remained on the outside but near the door while their inspection of the room was being made. None of these ladies smelled any odor of gas although they were persons of normal smelling ability.

There was evidence that the gas leak was located about thirty feet from the cold storage room; that workers dug a hole down to the pipe at this point; that water at this point was bubbling; that while the leak was being repaired three or four per-

sons were present and that the odor of gas was not smelled at first but later someone did smell it at that place. Also, during the course of the trial S. C. McIntosh, Director of the Gas Utility Division of the Railroad Commission, was called as a witness by appellee. He identified himself and said his department was called upon to interpret the above quoted rule. Thereafter upon appellant's objection to his testimony, the jury was withdrawn and his testimony was heard by the court, however such testimony was not admitted to the jury.

In answer to special issues the jury found that: (1) appellee did not fail to so odorize the natural gas involved in the explosion as to meet the requirements of the above quoted rule; (2) immediately prior to its escape from the pipeline the natural gas contained a malodorant sufficient to meet the requirements of the above quoted rule; (3) the natural gas that exploded had passed through soil or weathered limestone, and (4) that such passage did not remove a sufficient amount of the malodorant prior to the time it reached the cold storage room to render it insufficient to meet the requirements of the above quoted rule. The jury answered "none" to the issue inquiring what amount of money would reasonably compensate appellant for his injuries, and also answered "none" to the issue inquiring what amount of money would reasonably compensate appellant for medical and hospital expenses incurred by him as a proximate result of the accident.

On the above jury findings the trial court entered judgment that appellant take nothing.

In appellant's motion for new trial he alleged, among other things, that the jury was guilty of various acts of misconduct. At the hearing on this motion three jurors testified. The testimony of these jurors was that issue No. 1 supra was vigorously contested; that several votes were taken on the answer to this issue; that the first vote was evenly divided, six to six; that the second vote was eight votes that appellee did not fail to properly odorize the gas and four voted that it did fail, and that

upon the third vote nine jurors voted that appellee did not fail to properly odorize the gas and three voted it did fail. These jurors said they were the last jurors to vote that appellee did not so fail and the juror Hagler said that he was the last juror to so vote. The juror Hagler testified that the jury worked on issue one from about 1:30 p.m. until about 10 p.m. before it was finally answered and that during this time a great deal of discussion was had by the opposing groups trying to persuade the opposite group to come over to their respective point of view; that during this time it was mentioned more than once that the United States Government had paid appellant's hospital bills and had paid him for his injuries and that some of the jurors said these items could have been paid by the Government and more than likely had been so paid.

The juror Hagler testified that when the statement was made that the Government had paid appellant's hospital bills and had compensated him for his injuries that because appellant was a veteran and went to work at the hospital "they (the jurors) said that most all soldiers went to McCloskey (formerly being the institution herein designated as the hospital) and had free work done," and further that "they said that the Government taken care of the soldier boys through the VA or the Government hospital." The juror Murray testified that he was under the impression that appellant would not have to pay his hospital bills, that be so told the jurors and testified that some of the jurors were also under that impression.

The evidence of the three jurors further shows that the jury speculated that appellant had sued the wrong party and that he should have sued the Government or the Veterans' Administration because the gas that exploded had already passed appellee's meter.

The jurors testified that one juror related his experience with a gas leak in his home and said that at first his wife smelled the gas and he couldn't and said some people could smell better than others, and

that this incident was related and the statement was made while the jury was discussing the failure of the witnesses to smell gas at the leak and at the cold storage room. While the jury was discussing the cold storage room which was air tight and were discussing how the gas got in the room, where it came from and whether the gas was present in the room when the door was opened for the ladies on their inspection tour or whether it accumulated there after such time, one juror related his experience in operating a locker plant and said he did not think the gas came through the crevices or the expansion joints because the opening would seal itself if the gas came in fast. That they discussed what the witness McIntosh would have said about the malodorant in the gas if he had been permitted to testify, that who kept him from testifying was discussed, and that some jurors said he could have testified that the malodorant in the gas was satisfactory, while others said he could have testified it was not satisfactory. That the jury discussed reports made by appellee to the Railroad Commission with reference to the malodorant in the gas and that some of the jurors said they believed McIntosh would have confirmed those reports, and that the Railroad Commission would have protested if the reports had not been satisfactory.

The matters above mentioned were not admitted in evidence before the jury at the trial.

It does appear that when some of the above matters, especially the payment of hospital bills by the Government, were mentioned that the jurors were admonished they were not to be considered, however it further appears that they were again mentioned or discussed after such admonishment.

The testimony of these three jurors was not disputed. In fact the other jurors were not called to testify.

The motion for new trial was overruled and in response to appellant's request for findings of fact and conclusions of law the trial court found that the above acts of

jury misconduct occurred but concluded: (1) that because several times during the deliberations the jury was admonished not to discuss or consider matters outside of the record; that the admonitions were effective and that it does not reasonably appear that injury probably resulted to appellant; (2) that the statement that appellee had possibly sued the wrong party did not constitute misconduct but was a statement of the reasoning process by which the jury exonerated appellee of negligence; (3) that the statement of the jurors that they had smelled gas at their homes did not constitute misconduct because such statements related to common experience and not to expert or technical knowledge; (4) that the statement of the jurors that the gas could not have entered the cold storage room through the expansion joints was not prejudicial to appellant because the fact that gas did enter the room and caused the explosion was not disputed, and (5) that the reference to what the witness McIntosh would have testified if he had been permitted did not constitute misconduct because the evidence shows some of the jurors speculated that such witness could have testified that the gas was or was not properly odorized and that prejudice to appellant is not shown.

As to conclusion (1) supra the evidence shows that the admonition not to consider or discuss matters outside of the record was made when some juror suggested that the Government may have paid the hospital bills. The juror Hagler testified that when the remark was made he told them "there was no evidence bearing on anything like that" and further testified:

"Q. And when you said that the discussion of it ceased, didn't it? A. Well, I think they discussed it a little further.

"Q. Sir? A. I believe they discussed it after that again. I think it was brought up maybe twice.

"Q. Are you sure it was brought up twice? A. I am almost positive it was."

As to appellant having sued the wrong party this juror testified:

"Q. And who did the various jurors who brought it up think he should have sued? A. Well, they thought either the Government or the VA.

"Q. And when you say VA you mean the Veteran's Administration? A. The Veteran's Administration, yes, sir, the VA, yes, they said he had sued the wrong party.

"Q. What was the argument that they made, just in general, about why they thought he had sued the wrong party? A. Well, because these pipes belonged to the Veteran's Administration and this gas that caused the explosion had already passed the meters of the Lone Star Gas Company."

The juror Murray testified as to the statement and said:

"A. It was brought up I would say more than once. I wouldn't say several times but it was mentioned more than once I know."

and as to the hospital bills he said:

"A. Well, it was said, somebody said it, it was brought up whether or not he would have to pay it. Now, who brought it up I don't know. I know that I told whoever it was that we were talking to, there were several of us standing there, that I myself did not believe that he would have to pay for it. Then some of them, I do not remember who they were, agreed with me that they did not think that he would be charged for his hospital bill.

"Q. State whether or not any of them disagreed with you? A. I don't remember anybody disagreeing with me, no."

The juror Swope was asked if there was any discussion had in the jury room with reference to appellant having sued the wrong party and he said:

"A. Yes, that was made several times by first one and another.

"Q. What did they say about that? A. Well, I just heard them say that he had sued the wrong people, that he ought to have sued McCloskey.

"Q. Do you recall or did they say why he should have sued McCloskey? A. No, they didn't exactly say why. They just said they thought he had sued the wrong people, that he should have sued McCloskey instead of the Star Company, the Star Gas Company."

We find no evidence of any admonition being given the jury except that given by the juror Hagler.

The admonition must be limited to the remarks made by the jurors relative to appellant suing the wrong party and the payment by the Government of his hospital bills. It does not appear to have been effective to stop these discussions. In any event there is nothing in the evidence by which the admonition can be extended to other statements.

The question of whether the malodorant was or was not in the natural gas was one of the vital questions presented to the jury. This question appears to have been disregarded when the jury reasoned that the gas leaked from pipes not owned by appellee and after it has passed appellee's meter and that appellant had sued the wrong party. It also appears this question was not considered in the trial court's conclusion 4 supra.

The trial court permitted the jurors to testify as to the effect the discussions had on their verdict. The juror Swope testified that they did not influence his verdict. The jurors Murray and Hagler said they were influenced.

This evidence was not admissible and cannot be given any effect. Sproles Motor Freight Lines v. Long, 140 Tex. 494, 168 S.W.2d 642; Cloudt v. Hutcherson, Tex.Civ.App., 175 S.W.2d 643, error ref. w. m.

The findings of the trial court that the alleged misconduct did occur are

fully supported by the evidence and must be accepted here. Barrington v. Duncan, 140 Tex. 510, 169 S.W.2d 462. The misconduct being established it then becomes a question of law whether probable injury resulted. Rule 327, Texas Rules of Civil Procedure; Barrington v. Duncan, supra; City of Houston v. Quinones, 142 Tex. 282, 177 S.W.2d 259. However the finding of the trial court "that it does not reasonably appear that injury probably resulted to plaintiff" is not binding on the appellate court. Barrington v. Duncan, supra; Harris v. Levy, Tex.Civ.App., 217 S.W.2d 154.

Appellant sustained serious injuries, he remained in the hospital about one year and seven months and incurred medical and hospital bills in substantial amounts. When the jury speculated that he had been compensated for such injuries and bills and that he had sued the wrong party his right to recover therefor was necessarily prejudiced by the speculation that payment therefor had been made and that he had sued the wrong party. The fact that these matters were discussed after the admonition not to discuss or consider matters not in evidence was given refutes the probability that such admonition was effective.

The reference by the jurors to the witness McIntosh, their speculation as to what he would have said if he had been permitted by appellant to testify when coupled with the further speculation that the Railroad Commission would have protested if appellee's reports had not been satisfactory was receiving evidence, not admitted by the trial court, which was directly opposed to appellant's evidence that the gas in question was not properly odorized. Also the statement of the juror relating his experience with the gas leak at his home, that his wife smelled the gas but at first he could not but that later he did smell it was prejudicial to appellant because it was opposed to the evidence given by other witnesses who said they were present when the cold storage room was opened for inspection and at the gas leak on the outside of the room and who said they were possessed of normal smelling ability and did not smell the gas. The juror did not say he was or was not possessed of normal smelling ability, nor that the gas leaking at his home was or was not odorized, neither was he asked by the other jurors as to such matters. His statement that some people could smell better than others was applying a test different from the requirements of Rule 4 supra which rule was given by the trial court as the test to be applied by the jury in answering issue one.

The statement of the juror relative to his experience with gas at his locker plant appears to have been in connection with the discussion of the jurors as to whether the gas was or was not present in the cold storage room when the ladies were there on their inspection tour. Appellant appears to contend that the gas was in the room at the time the ladies were there and that if it had been properly odorized they would have smelled it. The jurors' statement was that if the gas had come in fast then the openings would have iced or sealed over. This statement then did not directly oppose appellant's contention.

The misconduct occurred during the jury's deliberations on issue one which was one of the vital issues in determining appellee's alleged negligence. It is our opinion that the misconduct was calculated to prejudice appellant and that it reasonably appears from all the relevant facts that injury probably resulted. City of Houston v. Quinones, supra. Certainly this conclusion must be reached when all the separate acts of misconduct are combined. Scoggins v. Curtiss & Taylor, 148 Tex. 15, 219 S.W.2d 451.

The judgment of the trial court is reversed and this cause is remanded.

Reversed and remanded.